UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| STANLEY WILLIAMS, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:09-cv-249-JAW |
| SOCIAL SECURITY ADMINISTATION COMMISSIONER, | ) ) ) ) | |
| Defendant | ) | |

**REPORT AND RECOMMENDED DECISION**

The Social Security Administration Commissioner found that Stanley Williams, a young man in his late 20s, has severe limitations associated with trauma-induced degenerative disk disease that preclude him from returning to his past, medium-intensity carpentry work, but not from returning to a subset of light work existing in the national economy, resulting in a denial of Williams's application for disability benefits under Title II and Title XVI of the Social Security Act. Williams commenced this civil action for judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g), alleging errors at Steps 3, 4, and 5 of the five-step sequential evaluation process applicable to disability determinations. Of these, the primary challenge concerns credibility determinations associated with the impact chronic pain has on Williams's residual functional capacity and whether this pain permits him to perform the light-duty work proposed by the vocational expert. I recommend that the Court affirm the administrative decision and enter judgment for the Commissioner.

STANDARD OF REVIEW

The standard of review is whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding. Richardson v. Perales, 402 U.S. 389, 401 (1971); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

DISCUSSION OF PLAINTIFF'S STATEMENT OF ERRORS

The decision under review is the January 28, 2009, decision of the Administrative Law Judge. The Administrative Law Judge found, at Step 2, that a work-related lifting injury[1] left Williams with degenerative disk disease consisting of "slight posterior displacement of the left S-1 nerve root and mild stenosis of L5-S1." (Finding 3, R. 9.) The limitation associated with this impairment is lower-back pain and pain that radiates to the legs, primarily the left leg. (Id.) Williams contends it was error to conclude that he did not meet Listing 1.04 and that he had residual functional capacity (RFC) to engage in light work despite his pain. These arguments implicate Steps 3, 4, and 5 of the sequential evaluation scheme.

**A.  Step 3**

Impairments identified as "severe" at Step 2 are measured at Step 3 against the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P, to

---

[1]  The alleged onset date coincides with the date of this injury, August 26, 2006. Williams was insured under Title II through December 31, 2009.

determine if they are severe enough to automatically qualify for disability benefits. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (describing satisfaction of a listing as calling for a conclusive presumption of a disabling impairment); Singh v. Apfel, 222 F.3d 48, 451 (8th Cir. 2000) ("If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience."). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Williams contends that the Administrative Law Judge did not have substantial evidence to support the finding that he did not meet Listing 1.04 and that the Administrative Law Judge failed to give good reasons for rejecting the contrary opinion of Dr. Frank A. Graf, M.D., P.C., an orthopedic surgeon. (Statement of Errors at 3-6, Doc. No. 19.)

Listing 1.04 is a musculoskeletal system listing related to disorders of the spine. The material portions of the Listing are as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. . . . (spinal arachnoiditis) . . .

or

>C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Appendix 1 to 20 C.F.R. Part 404, Subpart P, § 1.04 ("Appendix 1 § 1.04"). The Administrative Law Judge found that Williams's spinal disorder did not meet the Listing because the medical record does not reflect motor loss for purposes of § 1.04(A) or pseudoclaudication or inability to ambulate effectively for purposes of § 1.04(C).[2]

On December 16, 2008,[3] Dr. Graf provided Williams's counsel with a report based on "a review of medical history combined with orthopaedic examination." (Ex. 12F, R. 267.) In his report, Dr. Graf opined that Williams meets Listing 1.04 "with herniated nucleus pulposus with compromise of the S1 nerve root with neuroanatomic distribution of pain in both lower extremities." (R. 272.) Dr. Graf opined further that Williams "has been limited in basic functional movement patterns since his injury." (Id.)

The Administrative Law Judge found that Dr. Graf's opinion was not entitled to controlling weight on this issue because "the objective medical evidence does not support such a conclusion." (Finding 4, R. 10.) According to the Administrative Law Judge: "Physical examinations have not shown that his impairment is associated with the motor loss required to meet section 1.04A, and he does not have the pseudoclaudication and inability to ambulate effectively required by section 1.04C." (Id.) The question is whether there is substantial evidence in the record to support the Administrative Law Judge's finding that Williams does not

---

[2] Section 1.04(B) is not at issue.

[3] The date of the hearing before the Administrative Law Judge was January 28, 2009.

suffer from "motor loss (atrophy with associated muscle weakness or muscle weakness)" associated with § 1.04(A) or either pseudoclaudication or inability to ambulate effectively associated with § 1.04(C). Rejection of Dr. Graf's opinion was reasonable on this record.

As for § 1.04(A), although Dr. Graf diagnosed limitation in "functional movement patterns," this is not equivalent to "motor loss (atrophy with associated muscle weakness or muscle weakness)." Appendix 1 § 1.04(A). Dr. Graf's report of physical examination indicates: "Manual motor muscle testing of both ankle pivots . . . does not suggest weakness." (R. 271.) Additionally, a treating physician reported in April 2007 that "muscle strength is intact throughout the low back, hips, knees and ankles," albeit based on "brief screening examination." (Ex. 6F, R. 210.) A DDS consulting physician also indicated in a September 2007 report that strength is "normal in all limbs."[4] (Ex. 7F, R. 213.) This is substantial evidence that Williams does not meet § 1.04(A).

As for § 1.04(C), Dr. Graf's report includes a finding of spinal stenosis, but it is not clear whether that amounts to a finding of "spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging." Appendix 1 § 1.04(C). In particular, it is not specified whether spinal stenosis with corresponding radicular pain *is*, in essence, "pseudoclaudication" and the regulatory explanation is ambiguous on this question.[5] See Appendix 1 § 1.00(K)(3). I pass on this issue to address "inability to ambulate effectively." Id. The regulatory standard for this criterion is as follows:

---

[4] The report of Dr. Edward J. Harshman, M.D., reflects a physical examination of Williams. (R. 213.) Williams denies being present for such an exam, according to Dr. Graf's report. (R. 270.)

[5] Williams argues that Dr. Graf's report was sufficient to at least call for the Commissioner to conduct follow-up evaluations and assessments or to request clarification from Dr. Graf. If the Step 3 finding turned entirely on the issue of pseudoclaudication, I would likely recommend a remand, but it does not turn on this question because the record does not depict an inability to ambulate effectively.

> 2. How We Define Loss of Function in These Listings
>
> a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment . . . We will determine whether an individual can ambulate effectively . . . based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) . . .
>
> b. What We Mean by Inability to Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Appendix 1 § 1.00(B)(2). As the foregoing standard reflects, inability to walk without pain does not equate to inability to ambulate effectively. Dr. Graf's characterization that Williams has unspecified limitation in "basic functional movement patterns" is not a sufficient evidentiary basis to support a finding that Williams cannot ambulate effectively for purposes of the musculoskeletal system listing. Beyond Williams's failure to meet his burden on this issue, there

6

is substantial evidence in support of his ability to ambulate effectively.  Dr. Edward J. Harshman, M.D. reported normal gait, normal strength, and normal range of motion other than some limitation in back flexion (albeit still "good" back function).  (R. 213-14.)  Dr. Donald Trumbull's RFC Assessment (Ex. 9F) is also substantial evidence of an ability to ambulate effectively.  Among other findings, Dr. Trumbull notes medical records reflecting an ability to walk easily and an affinity for doing so as a form of exercise.  (R. 236.)  The Administrative Law Judge reasonably concluded that the record lacks reliable evidence of an inability to ambulate effectively.

The Administrative Law Judge did not err at Step 3.

**B.     RFC and Step 4**

At Step 4 of the sequential evaluation process the Commissioner evaluates the claimant's residual functional capacity (RFC), as well as the claimant's past relevant work.  If the claimant's RFC is compatible with his or her past relevant work, the claimant will be found "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(iv). 416.920(a)(4)(iv).  At Step 4 the burden of proof rests with the claimant to demonstrate that his residual functional capacity does not enable him to engage in his past relevant work.  Yuckert, 482 U.S. at 146 n.5;  20 C.F.R. §§ 404.1520(f), 416.920(f).

The Administrative Law Judge found that Williams's RFC does not permit him to engage in the occupation of carpenter, Williams's past relevant work.  (Finding 6, R. 13.)  However, beyond proving that his or her RFC is incompatible with past relevant work, a claimant bears the burden of proving the limitations that factor into the Commissioner's RFC finding.  20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); *Clarification of Rules Involving Residual Functional Capacity Assessments*, 68 Fed. Reg. 51,153, 51,157 (Aug. 26, 2003).  This is both a burden of production and a burden of persuasion and it rests with the claimant at Step 4.  68 Fed. Reg. 51,153, 51,155.

7

The Administrative Law Judge found that Williams "has the residual functional capacity to perform light work . . . with occasional limitations in bending, crawling, stooping, and kneeling and . . . must avoid heights and uneven terrain." (Finding 5, R. 10.) Given Williams's particular presentation, the question of whether he has a residual functional capacity to perform substantial work turns entirely on his subjective experience of pain. That is so because it is undisputed that "slight posterior displacement of the left S-1 nerve root and mild stenosis of L5-S1" could reasonably be expected to produce Williams's pain symptoms. All of the experts in the file (and the Administrative Law Judge) agree on that basic premise.

Because pain is the functional limitation that determines Williams's ability to sustain full-time, light-duty work, the Administrative Law Judge was permitted to look at the entire evidentiary record to evaluate the intensity and persistence of pain in order to determine the degree of limitation imposed on Williams's capacity for work. 20 C.F.R. §§ 404.1529(a), (c)(1), 416.929(a), (c)(1). The Administrative Law Judge did so and provided an extensive explanation for why he considered pain to be limiting only to the extent of the RFC finding. (R. 10-13.)

Williams argues that the Administrative Law Judge's RFC finding is unsubstantiated because the evidence relied on was not reliable when compared with the expert assessment of Dr. Graf, who submitted his evaluation more than a year after Dr. Trumbull's evaluation. Williams says that the Administrative Law Judge lacks qualification "to determine without expert assistance that Dr. Graf's examination report and RFC assessment evidence would not have substantially altered Dr. Trumbull's RFC opinion." (Statement of Errors at 3.) He also observes that Dr. Graf is an orthopedic specialist, unlike Dr. Trumbull. (Id.)

An administrative law judge is permitted to rely on the RFC assessment of a consulting physician over the competing assessment of a treating physician, provided the consulting

8

physician's assessment is consistent with the objective medical evidence and the administrative law judge provides reasons for rejecting the treating source's assessment. Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the ALJ], not for the doctors or for the courts."); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (reserving "controlling weight" for those treating source opinions that are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record" and articulating factors that govern the amount of weight assigned to treating source opinions); SSR 96-8p (describing evidence considered for purposes of RFC determination).

The "my expert is better than yours" issue, a recurring theme in respect to many RFC disputes, is particularly unpersuasive here, where the RFC dispute involves an evaluation of the intensity and persistence of pain that cannot be demonstrated with objective medical evidence. In any event, the Administrative Law Judge adequately explained his preference for Dr. Trumbull's RFC assessment (it corresponds with the Administrative Law Judge's own assessment of the entire record) and why he did not give Dr. Graf's RFC assessment controlling weight. The Administrative Law Judge explained that Dr. Graf's opinion was given little weight because there was only one visit and it appeared likely that Dr. Graf simply "accepted the claimant's description of his pain and resultant limitations as accurate." (R. 12.) As for the concern over new medical records, Williams's presentation does not reflect that Dr. Graf diagnosed deterioration in his condition subsequent to Dr. Trumbull's RFC assessment. Moreover, one medical record created between the Trumbull and Graf assessments (Ex. 11F, Orono Fam. Med.,

Hawkins, DO) indicates a January 15, 2008, visit for back pain at which Williams said "he does a lot of walking and that his back is feeling considerably better." (R. at 252.)

To make his RFC finding the Administrative Law Judge considered the opinions of Drs. Graf and Trumbull. 20 C.F.R. §§ 404.1527, 416.927. He also looked to the "entire case record" (R. 10), as permitted. Id. §§ 1529(a), (c)(1), 416.929(a), (c)(1); see also SSR 96-7p ("[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."). Ultimately, his RFC finding boils down to a credibility determination about the intensity and persistence of Williams's pain. It is the Commissioner's unenviable duty to make a credibility finding and the Court cannot overturn that finding just because it might draw different inferences from the record. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). The regulations provide a list of factors that frame the analysis, including: daily activities; the location, duration, frequency, and intensity of pain symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of pain medication; other treatment; other measures to relieve pain; and any *ad hoc* factors that might deserve consideration. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The Administrative Law Judge based his credibility determination on "violation of a narcotic pain medication contract," "extensive gaps in the treatment record," and refusal to attempt proposed treatments other than pain medication, including physical therapy and injections. (R. 11.) He concluded that these factors are "inconsistent with a conclusion that the claimant was experiencing daily, incapacitating pain." (Id.) From there, the Administrative Law Judge identified statements found in various medical records that suggested a relatively mild impairment, including

10

statements Williams made that suggest no more than moderate pain or pain that would not preclude other employment. (R. 12.) The Administrative Law Judge also considered record evidence of Williams's activities of daily living, including some hunting and fishing and wood stacking in 2007, and an appreciable amount of walking, as being inconsistent with disabling pain and buttressing his RFC finding. (Id.) In combination, the record sources underlying these conclusions are adequate to support the Administrative Law Judge's credibility determination.

Of these various observations by the Administrative Law Judge, the one that concerned me is the perceived narcotics contract violation.[6] The Administrative Law Judge indicated that Williams's credibility "turned on . . . violation of a narcotic pain medication contract with Marjorie Baker, F.N.P. at Newport Family Medicine," for which he cited "Exhibit 6." (R. 11.) The only relevant exhibit 6 is exhibit 6F, an April 2007 treatment note created by Dr. Eric Metzler, M.D., of Cold Stream Health Care. In his summary concerning Williams's visit to the office, Dr. Metzler states:

> He was evaluated at the emergency department at Greenfield and has been treated by Dr. [sic] Marjorie Baker at Newport Family Medicine. There was some confusion about his pain medication, which resulted in him being discontinued from care there. Since then he has gotten small amounts of treatment from emergency room visits at Penobscot Valley Hospital.

(R. 210.) The Newport Family Practice records are at exhibit 4F (R. 170-193.) These records reflect that Williams first visited the practice in September 2006, four weeks after his work injury, complaining of severe pain and demonstrating signs of impairment. (R. 192.) That treatment relationship persisted through March 2007, with periodic prescriptions of, among other

---

[6] Williams complains that the Administrative Law Judge did not adequately address the potential side effects of his medication. (Statement of Errors at 9.) The record does not support a finding of "side-effect" limitation and Williams's argument on this score is not supported by record citation. Moreover, the Administrative Law Judge's findings regarding gaps in treatment and the doctors' doubts about the need for narcotics inform this factor, although it is not squarely discussed.

11

medications, Percocet 5-325 mg, 1-2 tabs, four times daily, as needed. During this period Williams obtained the MRI of October 2006 that revealed spinal stenosis and displacement of the S1 nerve root. (R. 188.) At a February 2007 office visit the Percocet prescription was scaled back to one tab, four time daily, as needed, with Advil. (R. 174.) A physical exam note indicated: "seems slightly improved." (Id.) At a March visit the practice discontinued Williams's prescription for narcotic pain medication. (R. 171-72.) The record reflects that the practice was concerned that Williams had not attended his scheduled physical therapy and that they did not believe he should receive prescriptions for long-term narcotics use. The practice declined a renewal of the Percocet prescription and advised Williams to seek treatment from a source closer to his home, some 45 miles away. (R. 171.)

Williams obtained a prescription for 12 Percocet tabs that evening from an emergency care provider at Penobscot Valley Hospital in Lincoln, who attempted to communicate with FNP Baker about her refusal to prescribe. (R. 199-202.) A notation on an intake form reads: "Saw Dr. M. Baker today—refuses to give him a script—no f/u given." (R. 199.) The record reflects that Williams was forthcoming about his prescription history when he was at the hospital.

At oral argument I asked the Commissioner's counsel to bring the allegedly violated narcotics contract to the fore. He cited the portions of the record already discussed. He also cited pages 256-57 as proof of the underlying contract. That exhibit reflects that Williams entered into a narcotics contract with a subsequent provider, Orono Family Medicine, not Newport Family Practice. The Commissioner's counsel also cited a pain questionnaire that Williams filled out in July of 2007. In it, Williams acknowledged that the "doctor got a call from [a] pharmacists that I was suspicious when I filled my . . . prescription so I went to see a different doctor and he said that there was no reason for her to do that since all of my prescription[s] were

all on time and never early." (R. 111.) The cited portions of the record are not substantial evidence that Williams violated a narcotics contract because they do not demonstrate the existence of such a contract. An objective characterization of the record is that FNP Baker questioned Williams need for narcotic pain medication and was unwilling to keep writing Williams narcotic prescriptions. The record demonstrates that FNP Baker also questioned the efficacy of Williams driving 45 miles to Newport to obtain his pain medication when he could establish a relationship with another provider closer to home.

Although it was a bit hyperbolic to state that Williams's credibility "turns on" the violation of a narcotics contract, it would be fair to find that the evidence underlying this finding still favors the Administrative Law Judge's credibility finding because it reflects that a treatment provider questioned Williams's need for narcotic pain medication and was unwilling to continue writing narcotic prescriptions. In addition to this evidence, the Administrative Law Judge based his finding on other factors that combine to form substantial evidence for purposes of pain assessment. As the Administrative Law Judge indicated, his finding is "bolstered" by gaps in treatment and refusal to attempt alternative treatment, both of which factors were accorded "great evidentiary weight." (R. 11.) In addition to this evidence, the Administrative Law Judge relied on record evidence suggesting that Williams walks with relative ease, has described his pain as moderate in the past, has himself assumed that he could continue working in another line of work, and has engaged in some physical activities that would be regarded as relatively vigorous, such as hunting, fishing, and stacking wood. (R. 12.) In tandem, these factors are sufficient to support the Administrative Law Judge's credibility determination, even if the contract violation issue was overblown.

13

C.  **Step 5**

At Step 5, the burden shifts to the Commissioner to demonstrate that a significant number of jobs exist in the national economy that the claimant could perform, other than the claimant's past relevant work. 20 C.F.R. §§ 404.1520(g), 419.920(g); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982). This burden shift is limited to producing substantial evidence that a reasonable mind would accept as adequate to demonstrate the existence of other work the claimant can do. The Commissioner must prove that the claimant's RFC, age, education, and work experience enable the performance of other substantial work, but the Commissioner does not assume any burden to prove the non-existence of limitations that might foreclose other work. In other words, it remains the claimant's burden of production and persuasion at Step 4 to prove all relevant limitations concerning residual functional capacity. 68 Fed. Reg. 51,153, 51,155; see also id. at 51,157 ("[W]e are not responsible for providing additional evidence of RFC or for making another RFC assessment at step 5. [W]e use the same RFC assessment at step 5 that we made before we considered . . . step 4, a point in our process at which you have the burdens of production and persuasion.); 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2) (same); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (following Commissioner's regulatory assignment of burdens); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five.") (citing Yuckert, 482 U.S. at 146 n.5 (stating that the claimant is in the better position to provide information about his or her own medical condition)).

Ordinarily, the Commissioner will meet the Step 5 burden, or not, "by relying on the testimony of a vocational expert" in response to a hypothetical question whether a person with the claimant's RFC, age, education, and work experience would be able to perform other work existing in significant numbers in the national economy. Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). At the administrative hearing, an administrative law judge must transmit a hypothetical to the vocational expert that corresponds to the claimant's RFC. Id. (explaining that a vocational expert's answer to a hypothetical question is not reliable unless the hypothetical corresponds to conclusions supported by the medical authorities).

The Administrative Law Judge found that "there are jobs that exist in significant numbers in the national economy that [Williams] can perform." (Finding 10, R. 13.) This finding rested, in part, on the testimony of a vocational expert, who testified that someone with Mr. Williams's education and RFC, who is capable of skilled work, would be able to perform about 75% of the combined light-work and sedentary-work occupational base. (R. 34-35.) The vocational expert identified two potential jobs, one semi-skilled and the other unskilled. The Administrative Law Judge found that 75% of the unskilled, light-work base was available to Williams and that he could perform, in particular, the job of router, a light, unskilled occupation with approximately 350 jobs in the region, as testified to by the vocational expert. (R. 14.)

Williams contests this finding, arguing that he cannot lift 10 pounds with any frequency. (Statement of Errors at 12.) Williams also argues that he has a concentration deficit based on Dr. Graf's assessment. Williams lost these contests at Step 4 for reasons already indicated. Williams argues that the vocational expert's testimony is unreliable to the extent of the 75% opinion, characterizing it as an *ipse dixit* with no empirical basis. (Id. at 10-11.) The Court does not need to reach this issue because the vocational expert identified the router occupation, with 350

15

regional jobs and over 200,000 national jobs, to be consistent with Williams's RFC. (R. at 36-39.) This testimony sufficed as substantial evidence in support of the Administrative Law Judge's Step 5 finding. 20 C.F.R. §§ 404.1566, 416.966.

## CONCLUSION

For the reasons set forth in the foregoing discussion, I find no reversible error. Accordingly, I RECOMMEND that the Court AFFIRM the Administrative Law Judge's Decision and enter judgment in favor of the Commissioner.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 16, 2010